ENTERED
LOGGED     RECEIVED

MAR 1 2 2018

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                                    DEPUTY



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE SEARCH | ) | |
| OF ELECTRONIC DEVICES | ) | CASE NO.  **18-0453TJS** |
| CURRENTLY LOCATED AT | ) | |
| 7833 WALKER DRIVE, SUITE 580, | ) | |
| GREENBELT, MARYLAND 20770 | ) | |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

1.      I, Jeffrey J. Khoury, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") being duly sworn, depose and state as follows:

2.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

3.      I have been a Special Agent with the ATF since December 2016. I have attended the Federal Law Enforcement Training Center Criminal Investigation Training Program and the ATF Academy's Special Agent Basic Training Program, both located in Glynco, Georgia, for a combined period of twenty-seven weeks. I have received extensive formal and on-the-job training in the provisions of the Federal Firearms Laws administered under Title 18 and Title 26 of the United States Code. I have assisted in numerous investigations involving violations of the Federal Firearms and Controlled Substance Laws. I have received specialized training regarding, and have personally participated in, various types of investigative activities, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants and other individuals who have knowledge concerning violations of federal firearms laws; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and

1

trace devices; (g) the court-authorized interception of both wire and electronic communications (i.e., Title III wiretaps); and (h) the handling and maintenance of evidence.

4.      The statements in this affidavit are based on my personal knowledge and observations during the course of this investigation; information obtained by or known to other law enforcement agents that they conveyed to me; my personal review of records, documents and other physical evidence obtained during the investigation; and information gained through my training and experience. I have not included each and every fact known to me concerning this investigation.

5.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—cellular telephones described herein and in Attachment A (collectively, the "**Target Telephones**")—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

6.      This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant. The facts and information contained in this affidavit are based on my personal knowledge and information obtained from federal and state law enforcement officers. All observations referenced in this affidavit that I did not personally make were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s).

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.      As listed in Attachment A, the property to be searched are:

a.      **Target Telephone 1:** Black SAMSUNG Galaxy S8 cellular telephone, Serial Number: RF8JA04RWTN;

    b.    **Target Telephone 2:** Blue SKY DEVICES cellular telephone, IMEI 1: 358087060361701;

    c.    **Target Telephone 3:** Black SAMSUNG Galaxy Note cellular telephone, Serial Number: 357518057216624, and

    d.    **Target Telephone 4:** Silver LG flip cellular telephone, Serial Number: 603KPBF2257453.

The **Target Telephones** are currently in law enforcement's possession at 7833 Walker Drive, Suite 580, Greenbelt, Maryland 20770.

8.    The **Target Telephones** came into law enforcement's possession on February 1, 2018 during the execution of search warrants at Defendant James Lonnell VENABLE's residence located at 8712 Grasmere Court, Fort Washington, Maryland 20744 and on the Defendant's vehicle, a grey 2011 Lincoln MKS sedan, bearing Maryland temporary registration T437246.

9.    In my training and experience, I know that the **Target Telephones** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Telephones** first came into the possession of law enforcement.

10.    The applied-for search warrant would authorize the forensic examination of the **Target Telephones** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11.    I submit that there is evidence located in the **Target Telephones** that VENABLE has committed the following violations: conspiracy to distribute and possess with the intent to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a); and felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

12.    I know that individuals involved in drug trafficking often use cellular telephones

to facilitate their drug distribution operations and that drug dealers use telephones to thwart law enforcement efforts to penetrate the drug dealers' communication networks. The investigation to date provides probable cause that VENABLE possessed and distributed controlled substances and used cellular telephones to discuss addresses and locations of narcotic transactions, to discuss prices and amounts of narcotics, and to coordinate meetings with others to distribute narcotics.

13.     I also know that individuals involved in drug trafficking often use smart-phone computing technology to communicate with members of their organization regarding the distribution of narcotics, as well as to maintain records of their narcotics transactions, including but limited to banking and other financial transactions.

14.     I know that individuals involved in drug trafficking often use video recording devices, which are commonly-available as features on cellular telephones, to take video recordings of other members of their organization engaging in illegal activities, such as the distribution and/or possession of narcotics, as well as video recordings documenting the proceeds of narcotics trafficking.

15.     On January 30, 2018, the Honorable Charles B. Day, United States Magistrate Judge for the District of Maryland, issued federal search warrants for VENABLE's residence in Fort Washington, Maryland and for VENABLE's vehicle, based on a controlled purchase of heroin from VENABLE, along with a recent arrest of VENABLE, where VENABLE was charged with distribution of heroin and felon in possession of a firearm in Washington, D.C. (federal search warrant was also issued for VENABLE's vehicle, a grey 2011 Lincoln MKS sedan bearing Maryland temporary registration: T437246. (*See* Case Nos. 18-255-CBD and 18-256-CBD). This search warrant is incorporated by reference and attached as Government Exhibit

1.

16.      On February 1, 2018, during the execution of the search warrant at VENABLE's

residence, law enforcement recovered, among other items, a Sig Sauer Model 1911, .45 caliber

pistol bearing serial number 54B011667, digital scales, packaging material, spoons, strainers, a

silver press, plastic bottles containing an unknown powdery substance, and a plastic bag

containing a white/beige powdery substance (suspected heroin). Likewise, law enforcement also

recovered **Target Telephone 3** from VENABLE's residence—specifically, in the bedroom

where the above loaded firearm was located and recovered by law enforcement.

17.      During the execution of the search warrant on VENABLE's vehicle, law

enforcement recovered, among other items, digital scales, a silver press, and **Target Telephone**

**1 and 2**. At the time the search warrant on the vehicle was conducted, law enforcement observed

VENABLE operating his vehicle and conducted a traffic stop of VENABLE's vehicle. Law

enforcement located on VENABLE's person the following items: three plastic baggies

containing a white/beige powdery substance (suspected heroin), approximately $852.00 in U.S.

Currency, and **Target Telephone 4**. The white/beige powdery substance located on

VENABLE's person weighed approximately 10.6 grams and field-tested positive for the

presence of heroin.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18.      Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can

sometimes be recovered with forensics tools.

19.      Forensic evidence. As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

each of the **Target Telephones** was used, the purpose of its use, who used it, and when.  There is

probable cause to believe that this forensic electronic evidence might be on the **Target**

**Telephones** because:

a.   Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a

file (such as a photograph that has been deleted from the device).

b.   Forensic evidence on a device can also indicate who has used or controlled the

device. This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may,

after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who

used them, and when.

d.   The process of identifying the exact electronically stored information on a storage

medium that is necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators. Whether data stored on a computer is

evidence may depend on other information stored on the computer and the

application of knowledge about how a computer behaves. Therefore, contextual

information necessary to understand other evidence also falls within the scope of

the warrant.

**18-0453TJS**

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20.      <u>Nature of examination</u>. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the **Target Telephones** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Telephones** to human inspection to determine whether they contain evidence described by the warrant.

21.      <u>Manner of execution</u>. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

22.      I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Telephones** described in Attachment A to seek the items described in Attachment B.

Jeffrey C. Khoury Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Signed and sworn to before me this 15th day of February, 2018, in Greenbelt, Maryland.

Honorable Timothy J. Sullivan
United States Magistrate Judge

7

18-0453TJS

## ATTACHMENT A
## ITEMS TO BE SEARCHED

The property to be searched are:

    a.    **Target Telephone 1:** Black SAMSUNG Galaxy S8 cellular telephone, Serial Number: RF8JA04RWTN;

    b.    **Target Telephone 2:** Blue SKY DEVICES cellular telephone, IMEI 1: 358087060361701;

    c.    **Target Telephone 3**: Black SAMSUNG Galaxy Note cellular telephone, Serial Number: 357518057216624; and

    d.    **Target Telephone 4:** Silver LG flip cellular telephone, Serial Number: 603KPBF2257453.

The **Target Telephones** are currently in law enforcement's possession at 7833 Walker

Drive, Suite 580, Greenbelt, Maryland 20770.

**18-0453TJS**

## ATTACHMENT B
## LIST OF ITEMS AUTHORIZED TO BE SEARCHED AND SEIZED

1.      All records on the **Target Telephones** described in Attachment A that relate to

violations of 21 U.S.C. 846 (conspiracy to distribute and possess with the intent to distribute

controlled substances); 21 U.S.C. § 841(a) (possession with intent to distribute and distribution

of controlled substances); and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and

ammunition) committed by VENABLE including but not limited to:

     a.      Incoming/outgoing/missed phone call log(s);

     b.      Voicemail messages;

     c.      SMS/MMS messages and other communications and notes;

     d.      Photographs, audio clips, and video clips;

     e.      Telephone contact lists;

     f.      Any information pertaining to types, amounts, and prices of drugs trafficked as

well as dates, places, and amounts of specific transactions;

     g.      Any information related to (i) sources of drugs, (ii) drug customers, and/or (iii)

other drug trafficking associates (including names, addresses, phone numbers, or

any other identifying information);

     h.      Any information related to possession or usage of firearms and any other

dangerous weapons, as well as ammunition and other firearm paraphernalia

(including magazines, body armor, etc.);

     i.      Any information recording schedules or travels; and

     j.      All bank records, checks, credit card bills, account information, and other

financial records.

2.      Evidence of user attribution showing who used or owned the **Target Telephones**

9

**18-0453TJS**

at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

      3.      Records of Internet Protocol addresses used; and

      4.      Records of Internet activity, including, to the extent available, firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

18-0453TJS

# EXHIBIT 1

**18-0453 TJS**

# UNITED STATES DISTRICT COURT

for the

District of Maryland

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  18-255-CBD
8712 GRASMERE COURT, )
FORT WASHINGTON, MARYLAND 20744 )
)



## APPLICATION FOR A SEARCH WARRANT

     I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the _____ District of _____ Maryland _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

  ☑ evidence of a crime;

  ☑ contraband, fruits of crime, or other items illegally possessed;

  ☑ property designed for use, intended for use, or used in committing a crime;

  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Possession with intent to distribute and the distribution of controlled substances |
| 21 U.S.C. 846 | Conspiracy to possess with intent to distribute and to distribute a controlled substance |

The application is based on these facts:

See attached affidavit

  ☑ Continued on the attached sheet.

  ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested
      under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jeffrey Khoury, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Jan 30, 2018                    _____
*Judge's signature*

City and state:  Greenbelt, Maryland           Charles B. Day, U.S. Magistrate Judge
_____
*Printed name and title*

18-0453 TJS

AO 93 (Rev. 11/13) Search and Seizure Warrant                    Duty                                      JRS/ms

# UNITED STATES DISTRICT COURT
### for the
### District of Maryland

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.  18-255-CBD |
| 8712 GRASMERE COURT, | ) |
| FORT WASHINGTON, MARYLAND 20744 | ) |
| | ) |



## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the :  _____  District of  _____Maryland_____
*(identify the person or describe the property to be searched and give its location):*

See Attachment A-1.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before  *Feb. 12, 2018* *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  _____Duty Magistrate Judge_____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:  *Jan 30, 2018*
*1:28 pm*                           _____
                                                              *Judge's signature*

City and state:   Greenbelt, MD                      Hon. Charles B. Day, U.S. Magistrate Judge
                                                              *Printed name and title*

18-0453 TJS

## ATTACHMENT A-1 (the "TARGET RESIDENCE")

*Property to be Searched*

The property to be searched is 8712 Grasmere Court, Fort Washington, Maryland 20744 (the "TARGET RESIDENCE"). The TARGET RESIDENCE is a townhouse style residence. The exterior of the TARGET RESIDENCE is red brick with light colored siding near the door and white trim near the windows. The numerals "8712" are displayed in black print on a white background on the front of the TARGET RESIDENCE. There is a blue door on the front of the TARGET RESIDENCE.





## ATTACHMENT B

*Property to be Seized*

The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offense, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"), as described in the search warrant affidavit, including, but not limited to:

1.       Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

2.       Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchased of same, and related firearm paraphernalia, which constitute tools for the commission of the TARGET OFFENSES.

3.       Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

4.       Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

5.       Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

6.       Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other

27



**18-0453TJS**

items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES.

7.      United States currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds of the TARGET OFFENSES.

8.      Photographs, in particular photographs of coconspirators, assets, firearms, and controlled substances, which constitute evidence of the TARGET OFFENSES.

9.      Cellular telephones, computers, laptops, I-Pads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

10.     Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES; and

11.     Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES.



# UNITED STATES DISTRICT COURT

for the

District of Maryland



In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

DARK GRAY 2011 LINCOLN, BEARING VIN 1LNHL9ER2BG612437 AND MARYLAND TEMPORARY TAG T437246

Case No.  18 - 256-CBD

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2.

located in the _____ District of _____ Maryland _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Possession with intent to distribute and the distribution of controlled substances |
| 21 U.S.C. 846 | Conspiracy to possess with intent to distribute and to distribute a controlled substance |

The application is based on these facts:

See attached affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jeffrey Khoury, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Jan 30 2018

_____
*Judge's signature*

City and state:   Greenbelt, Maryland

Charles B. Day, U.S. Magistrate Judge
*Printed name and title*

**18-0453 TJS**

AO 93 (Rev. 11/13) Search and Seizure Warrant          Duty                                    JRS/ms

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| DARK GRAY 2011 LINCOLN, BEARING VIN 1LNHL9ER2BG612437 AND MARYLAND TEMPORARY TAG T437246 | ) ) ) |

Case No. 18-256-CBD

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ Maryland _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before *Feb 12, 2018* *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Duty Magistrate Judge _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:  *Jan 30, 2018 1:35 pm*

City and state:  Greenbelt, MD

*Judge's signature*

Hon. Charles B. Day, U.S. Magistrate Judge
*Printed name and title*



18-0453TJS

## ATTACHMENT A-2 (the "TARGET VEHICLE")

*Property to be Searched*

The property to be searched is a dark gray 2011 Lincoln, bearing VIN Number 1LNHL9ER2BG612437 and Maryland temporary tag T437246.

26



18-0453TJS

## ATTACHMENT B

*Property to be Seized*

The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offense, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"), as described in the search warrant affidavit, including, but not limited to:

1.        Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

2.        Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchased of same, and related firearm paraphernalia, which constitute tools for the commission of the TARGET OFFENSES.

3.        Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

4.        Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

5.        Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

6.        Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other



**18-0453TJS**

items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES.

7.     United States currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds of the TARGET OFFENSES.

8.     Photographs, in particular photographs of coconspirators, assets, firearms, and controlled substances, which constitute evidence of the TARGET OFFENSES.

9.     Cellular telephones, computers, laptops, I-Pads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

10.     Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES; and

11.     Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES.



## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH AND SEIZURE OF: | <u>FILED UNDER SEAL</u> |
| 8712 GRASMERE COURT, FORT WASHINGTON, MARYLAND 20744 | CASE NO. 18-255-CBD |
| DARK GRAY 2011 LINCOLN, BEARING VIN 1LNHL9ER2BG612437 AND MARYLAND TEMPORARY TAG T437246 | CASE NO. 18-256-CBD |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Jeffrey Khoury, being duly sworn, hereby depose, and state as follows:

1.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      I make this affidavit in support of search and seizure warrants for:

   a.   **8712 Grasmere Court, Fort Washington, Maryland 20744** (more fully described in **Attachment A-1** and hereinafter referred to as the **"TARGET RESIDENCE"**); and

   b.   **a dark gray 2011 Lincoln, bearing VIN 1LNHL9ER2BG612437 and Maryland temporary tag T437246** (more fully described in **Attachment A-2** and hereinafter referred to as the **"TARGET VEHICLE"**)

for the items and information more fully described in Attachment B.

3.      I have been a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since December 2016, and was a sworn law enforcement officer for the County of Arlington for over four years. I am currently assigned to the ATF Washington Field



Division, High Intensity Drug Trafficking Area (HIDTA) group, which is tasked with investigating drug-related crimes.

4.     I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Further, I have participated in numerous drug and firearm trafficking investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms.

5.     Since this affidavit is being submitted for the limited purpose of obtaining search warrants, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in this affidavit in support of the warrants. I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other agents and law enforcement officers, reports and data provided by other officers, which I have read and reviewed, and, in part, upon information and belief. The sources of my information and belief include, but are not limited to: a) oral and written reports regarding this and other investigations that I have received, directly or indirectly, from agents of the ATF, and officers of the Washington, D.C., Metropolitan Police Department (MPD) and Prince George's County Police Department (PGPD); b) physical surveillance conducted by your affiant and other agents and officers who have reported to me directly or indirectly; c) debriefings of confidential informants conducted by your affiant or reported to me directly or indirectly by other agents; and d) controlled drug

2



18-0453TJS

purchases, examples of which are detailed *infra*.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that

violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and the distribution of

controlled substances) and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to

distribute a controlled substance) (collectively, the "TARGET OFFENSES") have been

committed and are being committed, and that there is also probable cause to believe that within

the **TARGET RESIDENCE** and the **TARGET VEHICLE** items and information exist that

constitute evidence of the above criminal violations.

### AFFIANT'S KNOWLEDGE, TRAINING, AND EXPERIENCE RELATING TO NARCOTICS OFFENSES

7.      In the course of my training and experience, I have become familiar with the

methods and techniques associated with the distribution of narcotics, the laundering of drug

proceeds, and the organization of drug conspiracies.

8.      Based on my knowledge, training, experience and participation in numerous other

investigations involving marijuana, cocaine base, powder cocaine, heroin, and other controlled

dangerous substances, I know that:

(a)      Narcotics traffickers keep narcotics, narcotics related items and paraphernalia,

money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or

stash/storage locations, such as other apartments, garages, sheds, and storage lockers. In addition,

in an enterprise involved in the distribution and possession with intent to distribute crack

cocaine, powder cocaine, heroin, or marijuana, these locations may also contain apparently

innocuous materials that are used for specific purposes in the drug trade. For example, small and

large plastic baggies are the packaging material of choice for many narcotics traffickers; scales

3

**18-0453TJS**

are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the drugs being sold; microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are often used to "cook" powder cocaine into crack cocaine, or to mix and dilute heroin, and transport it discreetly thereafter.

(b)     It is also common for narcotics traffickers to distribute from specific locations other than their own residences, to include stash houses, the residences of family members and associates, both witting and sometimes unwitting, and other locations where trusted associates of the trafficker are allowed access, in order to protect the cache of drugs, as well as, the drug proceeds derived from the sale of these drugs. Such locations provide security for the trafficker, and it is a known location where customers go to obtain drugs.

(c)     Drug traffickers often use and retain firearms and other weapons to protect themselves and their drug proceeds as well as to secure their cache of narcotics and to intimidate rivals if encountered. Individuals who possess and store firearms in their residences, vehicles and/or stash locations, or in the residences of trusted associates, often also store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits, and ownership papers.

(d)     Narcotics traffickers may also keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase. These records may be in written or electronic form. Narcotics traffickers also often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, numerous business cards, photographs, address and telephone number books and papers, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances, and contact

4



18-0453TJS

information for associates and coconspirators in the narcotics trade. This documentary evidence may include credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking. These items are generally maintained and retained for long periods of time in the drug traffickers' residences or the residences of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated. It also is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to iPods and external storage drives; and the media to store information, including diskettes, tapes, or data storage devices.

(e)     Individuals involved in narcotics trafficking often conceal within their residences, the residences of family members, friends and associates, the places of operation of the drug distribution activity such as, stash houses or safe houses, or in business locations with which the traffickers are associated, large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes. Additionally, it is a common practice for drug dealers to

5



**18-0453TJS**

utilize safes within their residences, or the residence of a confidante, relative, or associate, in an effort to safeguard and more importantly, conceal such proceeds of their drug trafficking.

## PROBABLE CAUSE

9.     In June 2017, the ATF began investigating the trafficking of narcotics from 2408 Martin Luther King, Jr. (MLK, Jr.), Avenue, Southeast, Washington, D.C. 20020, which includes the Next Level Cuts barbershop (hereinafter, "the barbershop"), and adjoining property, by narcotics traffickers, including but not be limited to, Lonnell TUCKER, Lacey HAMILTON, Anthony FIELDS, and James VENABLE.[1]

### June 15, 2017 Controlled Purchase

10.     On June 15, 2017, at the direction of law enforcement, an ATF confidential informant (CI)[2] was instructed to attempt to purchase a quantity of narcotics from inside the

---

[1] As discussed herein, FIELDS and VENABLE have pending felony narcotics trafficking charges in Maryland and Washington, D.C., respectively. Both individuals also have multiple felony convictions arising out of separate events. TUCKER has four prior felony drug trafficking convictions arising out of three separate events, and HAMILTON has a prior felony drug trafficking conviction and a prior felony firearms conviction arising out of separate events.

[2] The CI provided information regarding various drug dealers in the District of Columbia. The CI was shown to be reliable to law enforcement. The CI never knowingly made any statements known to be untruthful to your affiant and other agents involved in this investigation. Most of the information that the CI provided was corroborated through subsequent surveillance and controlled purchases of narcotics. The CI was compensated by law enforcement for the assistance that it provided. During the course of the CI's relationship with law enforcement, the CI on one instance — during a controlled purchase — tested the narcotics purchased because the color of the narcotics appeared unusually white, and, therefore, the CI thought that the substance might not be real heroin. The CI was advised by law enforcement to never again test, sample, ingest, or otherwise cause narcotics to enter the CI's system. The CI had previous drug trafficking convictions and was familiar with methods, techniques, and practices often employed



barbershop. Prior to conducting the controlled purchase, the CI met with agents at a predetermined location. At this time, agents searched the CI and found no narcotics on the CI's person. Agents then provided the CI with $140.00 of pre-recorded ATF funds and equipped it with an audio recorder/transmitter. At 12:12 p.m., the CI walked on foot to the barbershop. Upon arrival, the CI went inside and waited to get a haircut. While getting a haircut, the CI made contact with an individual that the CI subsequently identified as Lonnell TUCKER by a confirmatory photograph. The CI had previously known TUCKER and had interacted with TUCKER on a number of prior occasions.

11.     The CI advised law enforcement that TUCKER asked it what it wanted and then TUCKER went into the bathroom for about three minutes and brought back one clear baggie of suspected heroin, in exchange for $100.00 in pre-recorded ATF funds. The CI further used $20.00 in pre-recorded ATF funds to purchase a haircut.

12.     At approximately 12:43 p.m., the CI exited the location. The CI subsequently turned over the suspected heroin to law enforcement. The CI also returned the remaining $20.00 in pre-recorded ATF funds to law enforcement. Agents also conducted a search of the CI and found no additional narcotics on the CI's person. The CI advised law enforcement that only certain people are allowed in the barbershop and those inside the barbershop keep the door locked when narcotics are being sold.[3] Law enforcement weight the seized suspected narcotics (approximately 0.7 grams) and sent them to the Drug Enforcement Administration (DEA) for

by individuals involved in the illicit distribution of controlled substances. In December 2017, law enforcement learned that the CI died of apparent cardiac arrest with opioids present.



18-0453TJS

testing. The DEA subsequently confirmed that the substance was heroin and without packaging, weighed approximately 0.58 grams.

### June 22, 2017 Controlled Purchase

13.    On June 22, 2017, the CI was directed to purchase narcotics from known drug traffickers who operated in and near the barbershop. The CI met with agents at a predetermined location. At this time, agents searched the CI and found no contraband on the CI's person. Agents then provided the CI with $200.00 of pre-recorded ATF funds and equipped it with an audio recorder/transmitter. The CI was driven to a location near the barbershop, where the CI could then walk to the barbershop.

14.    At approximately 4:07 p.m., the CI began walking to the barbershop. Upon arriving, the CI met with HAMILTON, who the CI had known and previously identified by confirmatory photograph. Law enforcement observed the CI and HAMILTON talking together, and then observed HAMILTON go over to an unidentified black male (UM) wearing an orange shirt. Law enforcement then observed the UM take a pair of keys, open the red door adjacent to the barbershop entrance, and go in for a few seconds.

15.    At approximately 4:16 p.m., law enforcement observed the UM come back out with his right hand cupped and raise his hand toward the CI. Law enforcement then observed the UM with money in his hand. The CI then went inside the barbershop briefly. At approximately 4:18 p.m., the CI exited the barbershop and walked back to law enforcement agents, while the UM knocked on the barbershop front door and reentered the barbershop.

---

[3] The audio equipment was unable to capture the communications between the CI and TUCKER given the volume of the music that was being played in the barbershop.



18-0453TJS

16.     Upon meeting with law enforcement, the CI turned over the suspected narcotics that it had obtained and returned $140.00 in pre-recorded ATF funds that were not used. A search of the CI was conducted and no additional contraband was found.

17.     The CI then advised law enforcement that the CI met LACEY outside of the barbershop. The CI told LACEY that it needed a gun and LACEY told the CI that LACEY would have one (a gun) for the CI by tonight or tomorrow. The CI then asked LACEY if he had any "junk" or "joint" and LACEY told the CI "my man got it right there" and directed the CI to the UM. The UM asked the CI how many it wanted, and the CI told the UM that it wanted five. The UM told the CI that he only had three left. The CI indicated that the UM then went inside the red door of 2408 MLK, Jr. Ave., S.E. for about 45 seconds and then came back out and handed the CI three "20s," or $20 zips of narcotics.[4] Law enforcement recovered from the CI three burgundy colored zips of suspected narcotics in exchange for $60.00 in pre-recorded ATF funds. The suspected narcotics were weighed (approximately 0.5 grams) and were sent to the DEA for testing. The DEA subsequently confirmed that the substance was heroin and without packaging, weighed approximately 0.285 grams.

**July 6, 2017 Attempted Controlled Purchase**

18.     On July 6, 2017, the CI was directed to purchase narcotics from known drug traffickers who operated in and near the barbershop. The CI met with agents at a predetermined location.  At this time, agents searched the CI and found no contraband on the CI's person. Agents then provided the CI with $600.00 of pre-recorded ATF funds. The CI was driven to a

---

[4] A review of the audio recording identifies that most of the recorded conversation is inaudible.

9



**18-0453TJS**

staging area near the barbershop. The CI then walked to the barbershop. At approximately 12:40 p.m., the CI made contact with TUCKER on the street near the barbershop's entrance and asked in coded language for heroin. TUCKER replied that he did not have heroin, but had marijuana. The CI subsequently observed TUCKER knock on the door of the barbershop and call to someone inside the barbershop to open the door. The CI then entered the barbershop. While inside the barbershop, the CI observed TUCKER enter and walk to the rear of the shop. TUCKER returned a short time later with suspected marijuana in his hands. The CI did not purchase any marijuana from TUCKER and exited the barbershop.

### July 20, 2017 Controlled Purchase

19.     On July 20, 2017, the CI was directed to purchase narcotics from known drug traffickers who operated in and near the barbershop. The CI met with agents at a predetermined location. At this time, agents searched the CI and found no contraband on the CI's person. Agents then provided the CI with $200.00 of pre-recorded ATF funds. The CI was driven to a location near the barbershop, where the CI could then walk to the barbershop.

20.     At approximately 4:39 p.m., the CI entered the barbershop and asked for TUCKER. An unidentified male told the CI, "L not here" and to look for him outside somewhere. The CI then exited the barbershop and walked down MLK, Jr. Avenue, S.E., toward Howard Road, S.E. The CI asked a group of people if they had seen TUCKER. At approximately 4:48 p.m., the CI walked back down toward the barbershop and spoke with an unidentified black male that directed the CI to a black male with a goatee, wearing a burgundy shirt, grey shorts, and red shoes, who was subsequently identified by law enforcement through surveillance as VENABLE. At approximately 4:49 p.m., VENABLE asked the CI what the CI was looking to

10



**18-0453TJS**

get. The CI said, "2." VENABLE told the CI that it will all be in one and that he is not going to separate it, and that the CI can do that on the CI's own. VENABLE then walked back to his silver Infinity, which bore Maryland tag 3CE3699. At approximately 4:53 p.m., the CI got into the front passenger seat of the Infinity. Venable told the CI to close the door to the vehicle and asked the CI how much the CI had and the CI answered, ". . . hundred," which is confirmed by a review of surveillance video/audio from the controlled purchase.[5]

21.    At approximately 4:53 p.m., the CI exited the vehicle and walked back to law enforcement. During a later debrief of the CI, the CI stated that a black male directed the CI to "Lonnel's man." The CI said VENABLE had the heroin on the center console and VENABLE provided it with one clear baggie of tan powder like substance in exchange for $200.00 in pre-recorded ATF funds. The seized suspected narcotics were weighed (approximately two grams) and were sent to the DEA for testing. The DEA subsequently confirmed that the substance was heroin and without packaging, weighed approximately 1.1 grams.

**August 23, 2017 Attempted Controlled Purchase**

22.    On August 23, 2017, the CI was directed to purchase a quantity of heroin from TUCKER. Prior to conducting the controlled purchase, the CI met with agents at a predetermined location. At the direction of law enforcement, the CI placed a recorded phone call to TUCKER on the target telephone. TUCKER told the CI that he was picking his kid up from school and would be back in 20 minutes. At this time, agents searched the CI and the CI had no contraband on the CI's person. Agents then provided the CI with $400.00 of pre-recorded ATF

---

[5] The video equipment was unable to capture video as the camera lens was blocked at times by the CI's shirt.



## 18-0453TJS

funds.

23.     The CI walked on foot to the barbershop. At approximately 1:50 p.m., the CI walked inside and waited for a haircut. At approximately 2:28 p.m., the CI exited the barbershop and walked back to law enforcement.

24.     Following the attempted controlled purchase, agents drove the CI back to the staging location. The CI returned $380.00 in pre-recorded ATF funds to the agents. Agents conducted a search of the CI and no contraband was found in the CI's possession. During a later debrief of the CI, the CI stated there were several people inside the barbershop. The CI further stated that TUCKER eventually came into the barbershop. TUCKER told the CI that TUCKER was waiting for an individual believed to be TUCKER's supplier of narcotics. The CI expended $20.00 in pre-recorded ATF funds for a haircut while engaging with TUCKER inside the barbershop.

**August 23, 2017 Attempted Controlled Purchase**

25.     On August 31, 2017, the CI was directed to purchase a quantity of heroin from TUCKER at or near the barbershop. Law enforcement drove the CI from the staging location to the target area. At approximately 12:16 p.m., the CI then walked on foot to the barbershop and made contact with TUCKER. At approximately 12:35 p.m., TUCKER told the CI that he was waiting on an individual named "Wayne," and that he better not have "gone off with his stuff." Two minutes later, at 12:37 p.m., an unidentified person stated that there were police in the area and TUCKER advised the CI that the CI will have to come back another time. The CI left the area and reunited with law enforcement.



**18-0453TJS**

## Global Positioning System (GPS) Warrants

26.     On September 11, 2017, United States Magistrate Judge Robin M. Meriweather

for the United States District Court for the District of Columbia issued a warrant (17-mj-662

(RMM)) that authorized law enforcement to ascertain the physical location of the target

telephone that was being used by TUCKER to traffic narcotics, including the geolocation feature

of the target telephone. GPS monitoring of the target telephone was initiated on September 11,

2017, and that authority expired on October 10, 2017, at 11:59 p.m.

27.     On October 18, 2017, United States Magistrate Judge Deborah A. Robinson for

the United States District Court for the District of Columbia issued a warrant (17-mj-768 (DAR))

that reauthorized law enforcement to monitor the GPS data from TUCKER's cellphone. GPS

monitoring of the target telephone was initiated on October 18, 2017, and that authority expired

on November 18, 2017, at 11:59 p.m.

28.     As stated below, GPS monitoring assisted law enforcement's investigation of

TUCKER.

## September 28, 2017 Surveillance

29.     On September 28, 2017, the ATF conducted surveillance of TUCKER. Law

enforcement began surveillance at 3919 23rd Parkway, Temple Hills, Maryland (believed to be

TUCKER's residence based on prior GPS data and law enforcement surveillance). GPS data

showed TUCKER leaving the area of his residence and then traveling to the barbershop. At

approximately 10:50 a.m., TUCKER was observed in the front passenger seat of a black Lincoln

parked on the 2400 block of MLK, Jr., Avenue, S.E. An unknown black male was observed in

the driver's seat of the vehicle. TUCKER was then observed going into the barbershop, coming



18-0453TJS

back out to the subject vehicle, and then leaning into the vehicle. Law enforcement could not see if an item was transferred between the parties. The vehicle then left the location without TUCKER.

30.     At 11:32 a.m., law enforcement observed TUCKER sitting on a crate near the corner of 2420 MLK, Jr. Avenue, S.E., just doors down from the barbershop. Law enforcement then observed a bald, black male wearing a white V-neck t-shirt, jeans, and white shoes direct another black male with short hair and a beard wearing a white t-shirt and jeans to TUCKER. In response, TUCKER stood up and reached into his front pants area and handed an item to the individual that was directed to him. Upon receiving the item, the unidentified male walked down MLK, Jr. Avenue, S.E. toward Howard Road, S.E.

31.     At approximately 12:15 p.m., after exiting the barbershop again, TUCKER was observed carrying a black bag with an older black male wearing a blue t-shirt. TUCKER entered the passenger seat and the older male got into the driver's seat of an older model green Buick that was parked in front of the barbershop. The vehicle then drove away and returned to the barbershop five minutes later. At that time, TUCKER was no longer in the vehicle. GPS monitoring placed TUCKER in the area of Bowen and Howard Road, S.E. At approximately 1:23 p.m., TUCKER was observed walking on foot without the bag, near the 2600 block of Bowen Road, S.E. in the area of the Oxford Manor Apartments. TUCKER then proceeded on foot back to the barbershop. At 1:38 p.m., TUCKER returned to the barbershop

32.     Based on my knowledge and experience, it appeared that TUCKER was continuing to engage in the distribution of narcotics and using the barbershop as a base of

14



**18-0453TJS**

operations for his narcotics trafficking, which included meeting customers and/or midlevel distributors and stashing narcotics inside the barbershop.

**October 20, 2017 Surveillance**

33.    On October 20, 2017, law enforcement conducted surveillance of TUCKER. Using GPS data, at approximately 9:04 a.m., law enforcement tracked the Defendant leaving 3919 23rd Parkway, Temple Hills, Maryland in a vehicle that had picked him up. The vehicle then traveled to MLK Jr., Avenue, S.E. and parked on the opposite side of the barbershop. TUCKER exited the vehicle and walked over to FIELDS. TUCKER and FIELDS walked together and crossed the street to the front of the barbershop. For approximately, the next two hours, TUCKER and/or FIELDS leaned inside vehicles and entered vehicles parked outside the barbershop, entered and exited the barbershop, entered and exited the convenience store down the block from the barbershop, and spoke with individuals outside and near the barbershop, all of which was consistent with engaging in a drug trafficking operation from the barbershop and surrounding area.

34.    Specifically, at 10:27 a.m., law enforcement observed TUCKER enter and exit the barbershop. At 10:35 a.m., law enforcement observed TUCKER get an item out of his left jacket pocket and hand it to an unknown male, who put the item in his front right pants pocket. At 10:39 a.m., TUCKER was observed counting money. At approximately 10:48 a.m., TUCKER was observed going into the barbershop and coming back at 11:00 a.m. At approximately 11:04 a.m., TUCKER entered the passenger side of a silver Infiniti SUV bearing Washington, D.C. tag FP9561 at the corner of MLK, Jr. Avenue, S.E. Two minutes later, at approximately 11:05 a.m.,



**18-0453TJS**

TUCKER exited the vehicle and at approximately 11:07 a.m., TUCKER entered the barbershop. At 11:32 a.m., TUCKER exited the barbershop and took a seat in front of the barbershop.

**November 2, 2017 Surveillance**

35.    On November 2, 2017, law enforcement conducted surveillance on the barbershop. At approximately 8:40 a.m., FIELDS was observed standing outside the barbershop and a silver 2010 Land Rover bearing VIN SALME1D45AA316133 and Washington, D.C. tag FR4706 was parked in front of the barbershop. At approximately 9:08 a.m., FIELDS entered the front passenger seat of the Land Rover, retrieved an unknown item, and handed the item to an unidentified black male wearing a black hat, gray sweatshirt, dark sneakers, and glasses, who was present near the barbershop. At 9:26 a.m., TUCKER appeared and entered the barbershop. At approximately 10:00 a.m., VENABLE exited a silver Infiniti bearing Maryland tag 3CE3699 after parking on MLK, Jr. Avenue, and met with TUCKER in front of the barbershop.

36.    At approximately 10:36 a.m., a male, subsequently identified by his Washington, D.C. driver's license as Darryl Donte FORTUNE DEWS, entered the driver's seat of a red Nissan Altima bearing Maryland tag 2AA0709 and drove away from the area. Law enforcement initiated a traffic stop because FORTUNE DEWS was operating the vehicle without wearing his seatbelt. During the traffic stop, law enforcement observed a white digital scale in FORTUNE DEWS' right jacket pocket. A search of the vehicle revealed approximately two ounces of suspected marijuana located in a nylon bag on the rear passenger's floorboard. FORTUNE DEWS had a large quantity of U.S. currency in his right front pocket. FORTUNE DEWS stated it was several hundred dollars and that he was a barber at the barbershop and the U.S. currency was the money that he made. An additional digital scale was observed in the rear passenger's

16



**18-0453TJS**

side map pocket, which is the pocket on the back of the front passenger seat.

## FIELDS' November 28, 2017 Drug Trafficking Arrest

37.    On November 28, 2017, at approximately 2:55 p.m., members of PGPD arrested FIELDS. FIELDS had been stopped after law enforcement personnel observed a silver Range Rover bearing Washington, D.C. registration FN-2655 speeding through a parking lot. FIELDS was the driver and sole occupant of the vehicle. FIELDS was ultimately arrested for possession with intent to distribute cocaine after law enforcement recovered approximately 83 grams of suspected cocaine and $7,300 in U.S. currency, including $2,000 in U.S. currency in FIELD's jacket pocket. FIELD's Maryland case (case number 2E00676860) is still pending while he remains in the community.

## November 30, 2017 Surveillance

38.    On November 30, 2017, law enforcement conducted surveillance on the barbershop. At approximately 9:17 a.m., FIELDS was observed using a key to unlock the red door to 2408 MLK Jr., Avenue, S.E., that is directly next to the entrance of the barbershop. Three minutes later, at approximately 9:20 a.m., FIELDS got into the front passenger seat of a white Honda Accord bearing Washington, D.C. tag EN7353. From approximately 9:20 a.m. to approximately 9:45 a.m., FIELDS was observed driving to various locations and individuals before returning to the barbershop, where he then stood outside and met with several individuals.

## VENABLE's December 5, 2017 Drug Trafficking and Firearm Arrest

39.    On December 5, 2017, at approximately 3:53 p.m., at 633 Yuma Street, Southeast, Washington, D.C. 20032, members of MPD's Narcotics and Special Investigations Division were conducting buy bust operations. After purchasing crack cocaine, a lookout was



**18-0453TJS**

given for the suspect dealer. Law enforcement moved in to stop the suspect involved in the transaction who was standing with an individual subsequently identified a VENABLE next to a Silver Mercedes E500 bearing Maryland Tag 3AJ6544. The passenger-side-front window of the vehicle was rolled down. VENABLE walked away as members of the arrest team were able to stop the suspect who was the dealer.

40.     Law enforcement inquired about who was the owner of the unsecured and unoccupied vehicle at which time VENABLE walked back to the vehicle and stated "that is my car." Law enforcement requested VENABLE provide his vehicle registration and identification. VENABLE then went to the front passenger seat of the vehicle and provided the title to the vehicle, his Maryland registration, and his insurance card. The vehicle was registered to VENABLE's wife and VENABLE was listed as an insured driver on the insurance card. When law enforcement asked VENABLE if there were any guns in the vehicle and whether he would open the passenger compartment under the front passenger seat, VENABLE quickly exited the vehicle and began to act nervous. A MPD K-9 unit was requested and VENABLE was advised that he was free to go if he wanted to leave. VENABLE stated, "ok" and left the scene on foot while holding a key fob. An MPD K9 responded to the location and gave a positive reaction for the presence of a firearm in the immediate area of the front-passenger-seat compartment. Upon opening the compartment, law enforcement observed a black FN FNS-9C .9mm handgun that had twelve rounds of 9mm cartridges in the magazine and one 9mm cartridge in the chamber.

41.     Approximately 10 minutes after the weapon was recovered, a male arrived on scene in a dark in color Volkswagen 4 door vehicle identifying himself as VENABLE's brother and the vehicle was turned over to VENABLE's brother. Officers could hear the cellphone

18



**18-0453TJS**

conversation at which time, VENABLE's brother stated, "where is his license" and law enforcement stated, "its in the glove box." Officer Tyson then heard VENABLE's brother state to the person on the phone, "yeah your license is in the glove box." Believing that VENABLE's brother was on the phone with VENABLE, law enforcement directed an undercover officer to respond to the scene and initiate observations of VENABLE's brother and VENABLE's vehicle. The undercover officer observed an Infiniti G37X drive up to VENABLE's brother and engage the brother in conversation. The Infiniti G37X was surveilled to the 4200 Block of Barnaby Street, Southeast. Officers responded to the area and observed VENABLE sitting in the front passenger seat of the Infiniti G37X. VENABLE was the front passenger and his wife, Tileta Venable, was the driver of the Infiniti. VENABLE was placed under arrest for carrying a pistol without a license based on the firearm recovered from his vehicle. In a search incident to arrest, officers recovered a purple rubber glove containing a plastic bag with approximately 8.17 grams of a tan substance that tested positive for opiates and a plastic bag with approximately 25.45 grams of a tan substance that also tested positive for opiates from the front inside belt line of VENABLE's pants. VENABLE was charged in D.C. Superior Court (case number 2017-CF2-20677) and was released to the community pursuant to the High Intensity Supervision Program.

**December 28, 2017 Surveillance**

42.     On December 28, 2017, law enforcement conducted surveillance on the barbershop. At approximately 10:48 a.m., HAMILTON parked his vehicle directly in front of the barbershop and entered inside. At approximately 10:52 a.m., HAMILTON exited the barbershop, proceeded to his vehicle, removed a jacket, and reentered the barbershop. At approximately 11:48 a.m., VENABLE approached a green Buick sedan bearing Washington, D.C. tag FP5291,

19



*18-0453 TJS*

which was occupied by three men. VENABLE walked to the front passenger door and had a short interaction with the occupants of the vehicle, and then jogged back into the barbershop.

**December 29, 2017 Surveillance**

43.     On December 29, 2017, law enforcement conducted surveillance on the barbershop. At approximately 9:53 a.m., FIELDS exited his vehicle and with the use of a key, opened the red door adjacent to the entrance of the barbershop. FIELDS then entered the red door and exited minutes later. At approximately 9:59 a.m., FIELDS again used a key to reenter the red door and reenter the building. At approximately 10:06 a.m., a grey LeSabre with Washington, D.C. license plate FP5291, which was occupied by two men, parked in front of the barbershop. An unidentified male then exited the barbershop and then engaged the men in the LeSabre through the front passenger window. At approximately 10:12 a.m., both men exited the vehicle. The driver retrieved a backpack from the back passenger area of the vehicle and entered the barbershop.

**January 18, 2018 Surveillance**

44.     On January 18, 2018, law enforcement conducted surveillance of FIELDS at 1227 46th Street, Southeast, Washington, D.C. 20019. At approximately 8:39 a.m., FIELDS was observed exiting the location and walking over to a white 2006 Chevrolet van bearing VIN 1GCFG15X361264964 and Maryland *temporary* tag T438988 that was parked on the opposite side of the location, and which was registered to FIELDS at the location. Surveillance units then observed FIELDS enter the passenger side of the Chevrolet.  Law enforcement then observed FIELDS get into the driver's side of a black 2006 Cadillac bearing VIN 1G6KD57Y86U104133

20



18-0455TJS

and Washington, D.C. tag FN2665 that was parked behind the Chevrolet.[6]

45.     At approximately 8:46 a.m., law enforcement observed FIELDS get into the driver's seat of the Land Rover, which was parked behind the Cadillac, and which was registered to FIELDS at 1227 46th Street, S.E. Law enforcement then observed FIELDS enter the back of the Land Rover and hold documents from inside the vehicle in his left hand. At approximately 8:48 a.m., FIELDS used a key on what appeared to be a Redskin's lanyard to unlock the door and enter the residence. FIELDS exited the residence quickly thereafter. FIELDS then got into the driver's seat of a light tan 2009 BMW bearing VIN WBAKB83569CY61717 and Washington, D.C. tag FP3162 that was parked in front of the residence. At approximately 8:51 a.m., surveillance units observed FIELDS drive off in the BMW and make a right on Reed Terrace, S.E.

46.     On January 18, 2018, law enforcement also established an observation post to observe activity occurring at the barbershop. At approximately 9:43 a.m., law enforcement observed FIELDS exit the BMW after parking in front of the barbershop. FIELDS then walked to the intersection of MLK, Jr., Avenue and Talbert Street, S.E., and subsequently walked back to the barbershop and opened the red door on the right front of the building using keys. FIELDS then entered through the red door. At approximately 10:00 a.m., law enforcement observed FIELDS exit the right front red door of the barbershop building and meet with a black male and a black female for a brief period. FIELDS then entered the barbershop when a person inside opened

---

[6] Surveillance reflects that FIELDS has been interchanging license tags on his vehicles. The tag for the Cadillac — Washington, D.C. tag FN2665 — was previously observed on the Land Rover, before the Land Rover's license plate was changed to Washington, D.C. tag FR4706.



**18-0453TJS**

the door.

**Identifying the TARGET RESIDENCE and the TARGET VEHICLE**

47.    As discussed above, on December 5, 2017, VENABLE was arrested after a gun was located inside a 2005 Mercedes-Benz sedan, bearing Maryland registration 3AJ6544, that he claimed belonged to him. A Maryland DMV registration query of the license plate yielded a registered owner return of Tileta Venable, at the **TARGET RESIDENCE**.

48.    On December 27, 2017, law enforcement conducted surveillance at the **TARGET RESIDENCE**. During surveillance, law enforcement contacted personnel from the D.C. Pretrial Services Agency, which confirmed VENABLE's ankle monitor showed him at the **TARGET RESIDENCE**. Located in the parking lot was a black 2008 Lincoln bearing VIN 3LNHM28T68R653988 and Maryland tag 6BP8361. A Maryland DMV registration query yielded a registered owner return to VENABLE.

49.    On December 28, 2017, at approximately 8:00 a.m., law enforcement conducted surveillance at the **TARGET RESIDENCE**. At approximately 11:04 a.m., law enforcement observed VENABLE exiting the front door of the **TARGET RESIDENCE**. Law enforcement observed VENABLE enter a black Mercedes C300 sedan, bearing Virginia registration VSG-7431, which had also been observed the morning before and was registered to EAN Holdings as a rental vehicle. Law enforcement observed the Mercedes parked in front of the **TARGET RESIDENCE**, in space number 44. VENABLE then traveled to the barbershop and arrived at the location at 11:19 a.m. At the same juncture, law enforcement was conducting surveillance of the barbershop.

50.    On January 18, 2018, law enforcement also conducted surveillance in the area of



**18-0453TJS**

the **TARGET RESIDENCE**. At approximately 8:09 a.m., law enforcement observed VENABLE walk from the direction of the front door of the **TARGET RESIDENCE**, carrying a white garbage bag in his left hand. Law enforcement observed VENABLE walk from the front of the **TARGET RESIDENCE** to a blue dumpster, which was located directly in front of the **TARGET RESIDENCE**. VENABLE deposited the white garbage bag into the blue dumpster.

51.     Upon throwing away the white garbage bag, VENABLE walked to the **TARGET VEHICLE**. Law enforcement observed VENABLE enter the front driver side door of the **TARGET VEHICLE**, which was backed into reserved space number 46. The area occupying the front license plate was an advertisement for an automobile dealership. Law enforcement observed VENABLE seated in the driver seat of the **TARGET VEHICLE** for approximately five minutes on his cellular phone. VENABLE was the sole occupant of the **TARGET VEHICLE**. During surveillance of the location, law enforcement also observed the aforementioned black 2008 Lincoln, parked in parking space labeled, "Reserved 42."

52.     At approximately 8:15 a.m., VENABLE drove out of the space in the **TARGET VEHICLE**, and proceeded towards the main road (Devon Hills Drive). As the **TARGET VEHICLE** passed, law enforcement observed the rear license plate of the vehicle. A Maryland DMV registration query yielded that the **TARGET VEHICLE** was registered to Tileta Venable, at the **TARGET RESIDENCE**.

## CONCLUSION

53.     Based on the above information, I respectfully submit that probable cause exists to believe that evidence of the federal violations will be found within the **TARGET RESIDENCE** and the **TARGET VEHICLE**. I therefore seek warrants for the **TARGET**



18-0453 TJS

**RESIDENCE** and the **TARGET VEHICLE** to search for and seize the items and information described in Attachment B.

_____
Jeffrey Khoury, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn to before me on January 30, 2018.

_____
Honorable Charles B. Day
United States Magistrate Judge

24

18-0453TJS

## ATTACHMENT A-1 (the "TARGET RESIDENCE")

*Property to be Searched*

The property to be searched is 8712 Grasmere Court, Fort Washington, Maryland 20744 (the "TARGET RESIDENCE"). The TARGET RESIDENCE is a townhouse style residence. The exterior of the TARGET RESIDENCE is red brick with light colored siding near the door and white trim near the windows. The numerals "8712" are displayed in black print on a white background on the front of the TARGET RESIDENCE. There is a blue door on the front of the TARGET RESIDENCE.



25



18-0453TJS

## ATTACHMENT A-1 (the "TARGET RESIDENCE")

*Property to be Searched*

The property to be searched is 8712 Grasmere Court, Fort Washington, Maryland 20744 (the "TARGET RESIDENCE"). The TARGET RESIDENCE is a townhouse style residence. The exterior of the TARGET RESIDENCE is red brick with light colored siding near the door and white trim near the windows. The numerals "8712" are displayed in black print on a white background on the front of the TARGET RESIDENCE. There is a blue door on the front of the TARGET RESIDENCE.





18-0453TJS

## ATTACHMENT A-2 (the "TARGET VEHICLE")

*Property to be Searched*

The property to be searched is a dark gray 2011 Lincoln, bearing VIN Number 1LNHL9ER2BG612437 and Maryland temporary tag T437246.

26

**18-0453 TJS**

## ATTACHMENT B

*Property to be Seized*

The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offense, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses"), as described in the search warrant affidavit, including, but not limited to:

1.    Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

2.    Weapons, including but not limited to revolvers, semi-automatic pistols, rifles and ammunition, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchased of same, and related firearm paraphernalia, which constitute tools for the commission of the TARGET OFFENSES.

3.    Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

4.    Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

5.    Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

6.    Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other

27



**18-0453 TJS**

items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES.

7.    United States currency, precious metals, jewelry and financial instruments, stocks and bonds, which constitute proceeds of the TARGET OFFENSES.

8.    Photographs, in particular photographs of coconspirators, assets, firearms, and controlled substances, which constitute evidence of the TARGET OFFENSES.

9.    Cellular telephones, computers, laptops, I-Pads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

10.    Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES; and

11.    Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES.

